GAAR, SCOTT & COMPANY, Appellants, v. LOUISA STOLTE AND HARRY STOLTE.

115  139
123  580

**Fraudulent Conveyance:** EVIDENCE ESTABLISHES: *Husband and wife—Consideration*. In a suit to subject land conveyed by a husband to his wife to the payment of judgments against the husband, it appeared that the husband purchased the land,

paying $1,600 in cash therefor, and giving a mortgage of $1,440 for the balance. Just prior to the purchase, the husband, by different withdrawals, drew $1,500 out of a $2,000 deposit which he had in the bank. The husband testified that his money was not used in the purchase, but his testimony as to what he did with it was conflicting. The wife testified that a few days before the purchase her father, who was a man of limited means, and who had nine other children, called, and, on her complaint that her husband might give up farming, for fear of losing his implements and horses, said that he would let her have money, and she could take care of it, and when he got old he would make his home with her, and a few days later, without taking any note or receipt, he gave her $1,500, which he had hoarded for four years in a bureau drawer at home, fearing to trust it to the banks or in loans. This money, it is claimed, was loaned by her to her husband at 8 per cent. interest, and was used by him in the purchase of land. The conveyance to the wife was made on the day the first judgment was entered against her husband. *Held*, that it was so improbable that the wife furnished the money used in the purchase of the land that a finding of a lien thereon in her favor was not sustained.

*Appeal from Dickinson District Court.*—HON. W. B. QUARTON, Judge.

THURSDAY, DECEMBER 19, 1901.

THREE judgments, aggregating $528.38 and costs, were rendered in favor of plaintiff and against Henry Stolte in 1897 on an indebtedness previously contracted. July 5th of that year said Henry conveyed 160 acres of land he then owned to his wife, Louisa Stolte, and the object of this suit is to subject this land to the payment of these judgments. Hearing was had on written evidence, and decree entered as prayed, except that the liens of the judgments were made subject to that of said Louisa for $1,500, with interest at 8 per cent, per annum from September 20, 1894, and defendants' homestead interest in the land. The plaintiff appeals. *Modified* and *Affirmed*.

*W. P. Briggs* for appellant.

*L. E. Francis* and *W. S. King* for appellees.

LADD, J.—The sole question is whether Louisa Stolte loaned her husband, Henry, $1,500, with which he purchased the 160 acres of land in controversy. If she did not, the lien should not have been established in her favor, superior to that of plaintiff's judgments. The deed to the land, running to Henry, was acknowledged in Buren county, Ill., September 24, 1894, and was delivered to him October 6th of the same year, at which time Henry paid $1,600 in cash, and executed a mortgage of $1,440 for the balance of the purchase price. That he then had means out of which to have made this cash payment, the records affords convincing proof. It was stipulated by the parties that February 1, 1893, he sold 80 acres of land in Cedar county for $4,160, of which $1,220 was paid in cash, and seven notes, of $420 each, secured by mortgage on the land, payable a year apart, executed for the balance. The first note was paid February 4, 1894, and in August of that year the remaining six were sold to the Security Savings Bank of Cedar Rapids for $2,513.30. Of this Henry received $513.30 in cash September 3, 1894, and deposited the remaining $2,000 in the Bank of Ocheyedan. Subsequently, September 11th, the money was withdrawn from that bank, and its draft therefor presented to the First National Bank of Hartley. It paid Henry $1,000 in cash, and executed a certificate of deposit for $1,000. Of this, $500 was paid September 26th, $200 December 7th, and the balance January 3, 1895. A very reasonable explanation of the sale of these notes is that it was to procure money for the purchase of the land, and it will be noticed that, of the money deposited, $1,500 was withdrawn shortly before payment, and that he had received over $500 September 3d previous. Quite naturally we turn to the testimony of Henry Stolte, in order to learn what was done with this money. He moved to Hartley in January, 1893, and lived there until he took up his residence near Ocheyedan in the spring of 1894. According to his story, the price of the land in Cedar county was $4,000, instead

of $4,160; he was paid no cash, though $1,220 was actually paid at the time; the balance after the first payment was given him personally in Cedar county in 1893, though in fact covered by notes upon which he realized after he had moved near Ocheyedan. In the first instance he testified to having paid $1,000 to the guardian of his brother, Louis, and $800 to each of his sisters, Mary and Sophia, immediately upon the receipt of the money, in 1893, and to have used up the balance, save $400, in living; but, while adhering to the statement that he had paid Sophia at the time he claims to have received the last payment in Cedar county and returned the notes to the purchaser at a store, he concluded that he had not paid the guardian of Louis or Mary from the money he had kept in the house since the summer of 1893 until he went on the farm near Ocheyedan. A part of his testimony may be set out: "Q. Well, you did not have this money, did you,—only $400 of it,—when you bought the Dickinson county land? A. That was all. Q. Well, you could not have paid her afterward? A. I said before or after. I don't know for sure. Q. If you only had $400 left— A. I save that money for my sister. Q. Yes, I know; but did you have that besides the the $400? A. I save that. I did not figure on that. I mean that when I left Hartley, to go north of Ocheyedan, I had $400, which I got from Kruckerberg, besides Louis' and Mary's,—$800 going to Mary, and $1,000 going to Louis. I did not keep track of when I paid Mary. When I left Hartley I had the $800 and the $1,000 and $400 besides. Kept that money in the house all the time. Q. Whereabouts in the house? A. Away up in the corner some place, where nobody could find it." Evidently the evidence of this witness is so contradictory in itself and so opposed to the conceded facts as to be totally unworthy of belief. If he ever paid the guardian, it must have been before the latter's accounts were settled, July 23, 1894, and therefore from the cash payment or from the proceeds of the first note. He makes

no claim of paying his sister Sophia, save when in Cedar county to collect the deferred payments on the land. But, as he was never there for any such purpose, his statement concerning her must be regarded as untrue. The $800, if he is to believed, was set apart for Mary while at Hartley. There is no pretense on his part that any portion of the proceeds of the sale of these notes in August, 1894, obtained through the Bank of Ocheyedan, was paid to any of his brothers or sisters. What, then, was done with his money? The record offers no explanation, save its use in the purchase of this farm. Bearing in mind that Henry Stolte insists that he had at least $400 in cash stowed away at home from the time he left Hartley till this purchase was made, and the conceded fact that he held the six notes, of $420 each, up to the time of their sale to the Security Savings Bank, let us turn to the testimony of his wife and her father. Very conveniently, the father dropped in a few days before this land was bought. Apparently he was a man of limited means, but of numerous progeny, having nine children besides Louisa. According to their story, she complained to him that her husband had but a team, wagon, some farm machinery, and cows, and would quit farming for fear of losing even these. Thereupon, without any farther arrangement, he (the father) said he would let her have money, and she could take care of it, and when he got old he would make his home with her. Two or three days later he is said to have brought to her $1,500 in "all kinds of money," in a cigar box in the front part of his buggy, and to have turned it over to her without writing or other arrangement than that mentioned. He gave with the proverbial generosity of a prince. Nothing was exacted save an implied promise which his circumstances indicated she would never be called upon to fulfil, for he then had a family and a home. Though for four years he had hoarded the money in a bureau drawer at home, fearing to trust it to the keeping of banks or loan to neighbors, he was ready to part with it on a mere hint

from this one of his ten children, without thought of return.
For the father testified that all but $45 was pension money,
of which $1,000 had been received four years previous, and
the remainder in quarterly payments of $42, and later,
of $51, from the government. When received, she, too,
stowed it away in a bureau drawer, and told Henry. The
latter, as it turned out, was "figuring" on the land at about
this time, and, although he had plenty of his own, proposed
to borrow this; and she let him have it on his oral promise to
return it, with interest at 8 per cent. per annum, when she
wanted it. He, too, put it in a bureau drawer, but whether in
the one with the notes and the $400 does not appear. The
method has its advantages, apparently understood by all
three of the witnesses. Money kept as they pretend leaves
no record. But the entire story is so extremely improbable
that it ought not to be accepted. True, it is not directly
contradicted. Its nature is such as to defy contradiction,
save by its inherent improbability, and inconsistency with
surrounding circumstances. Is it at all reasonable to sup-
pose this father, with a large family, would hoard the bene-
factions of the government in the manner claimed for years?
And, if he had, that he would part with all to the one child,
who, if her statement be true, was without business sagacity
or even prudence? And this without thought or suggestion
with respect to the use she would make of it? And with
no thought of return? Men who thus hoard can be relied
upon not to let go so easily. Again, it is at all likely that
he happened along just as Henry was "figuring" on buying
land? Or that she loaned him the money without knowing
anything of the cost of the land? Or that Henry would
be willing to borrow at 8 per cent. interest when he had
$2,000 of his own in the bank, on which he was receiving
no return? If Henry used $1,500 borrowed of his wife,
what did he do with that he had in the banks? A single
circumstance, though somewhat unusual, if possible, might
not discredit the account given or an alleged transaction; but,

where every element and detail are inconsistent with the ordinary course of things as to be unlikely and improbable, the whole may, as a general rule, be safely rejected as untrue, unless corroborated by extrinsic facts.   Courts are not bound to believe that which men of observation and experience in the affairs of life uniformly reject as false.   The tale told by these witnesses has all the elements of a manufactured story.   In view of this, their relationship, and the conveyance to Louisa Stolte the very day the first judgment was rendered, we are constrained to hold the transfer to have been in fraud of creditors.   The decree will therefore bo so modified as to eliminate the lien of Louisa Stolte.—MODIFIED and AFFIRMED.